# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF KENTUCKY
# CENTRAL DIVISION -- LEXINGTON

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>    Plaintiff,<br><br>V.<br><br>ABDUL HADI,<br><br>    Defendant. | CRIMINAL NO. 5:19-101-KKC<br><br><br>**OPINION AND ORDER** |

**\*\*\* \*\*\* \*\*\***

This matter is before the Court on the defendant Abdul Hadi's motion (DE 44) to revoke the magistrate judge's detention order.

Hadi is charged with one count of conspiring to kidnap certain individuals for ransom in violation of 18 U.S.C. § 1201(c) and one count of conspiring to use interstate facilities in the commission of a murder for hire in violation of 18 U.S.C. § 1958.

The government moved that he be detained pending trial. Pursuant to 18 U.S.C. § 3142(e)(1), a defendant must be detained pending trial if, after a hearing, a judicial officer finds that no condition or combination of conditions will reasonably assure his appearance at future court proceedings and the public safety.

The magistrate judge conducted a detention hearing and determined that the government had proved by a preponderance of the evidence that there are no conditions or combination of conditions that would assure Hadi's appearance at future court proceedings. (DE 16, Detention Order.) The magistrate judge also concluded that the government has presented clear and convincing evidence that Hadi poses a danger to another person or to the community. Accordingly, the magistrate judge ordered that Hadi be detained pending trial. Hadi then filed this motion, asking the Court to revoke the magistrate judge's detention order.

The Court will conduct a *de novo* review of the magistrate judge's detention order. The statute providing for review of the magistrate judge's detention order does not specifically require that the Court conduct an additional hearing. 18 U.S.C. § 3145(b). In his motion, Hadi does not request a hearing, and he does not rely on or explain evidence not already in the record that he would proffer at a hearing in support of the motion to revoke the detention order. Accordingly, a second detention hearing is not necessary. *See United States v. Gaviria*, 828 F.2d 667, 670 (11th Cir.1987); *United States v.* Jones, No. 12:CR-105, 2012 WL 6737784, at * 1, n.1 (D. Conn. 2012); *United States v. Burks*, 141 F. Supp. 2d 1283, 1285 (D. Kan. 2001);*United States v. Alonso*, 832 F. Supp. 503, 504 (D. Puerto Rico 1993); *United States v. Bergner*, 800 F. Supp. 659, 661 (N.D.Ind.1992).

In resolving this motion, the Court will rely on the affidavits filed in support of the criminal complaints in this matter, the indictment, the Pretrial Services Report prepared by the U.S. Probation Office, the transcript of the detention hearing, and the pleadings submitted by the parties.

Detention is appropriate if the government proves by a preponderance of the evidence that the defendant is a flight risk or if it proves by clear and convincing evidence that the defendant poses a danger to the public or any person. *United States v. Hinton*, 113 F. App'x 76, 77 (6th Cir. 2004).

In making this determination, the court is to consider "the available information" on the following factors: the nature and circumstances of the offense charged, including whether the offense is a crime of violence; the weight of the evidence against the person; the history and characteristics of the person; and the nature and seriousness of the danger to any person or the community posed by the person's release. 18 U.S.C. § 3142(g).

As to the nature and circumstances of the offenses at issue here, conspiracy to commit murder

2

for hire and to kidnap are both serious charges. The murder-for-hire charge carries a possible prison term of 10 years; the kidnapping charge carries a maximum life sentence. Further, both are "crimes of violence." The Bail Reform Act defines a crime of violence as "an offense that has as an element of the offense the use, attempted use, or threatened use of physical force against the person or property of another," or "any other offense that is a felony and that, by its nature, involves a substantial risk that physical force against the person or property of another may be used in the course of committing the offense." 18 U.S.C. § 3156(a)(4)(A),(B). Thus, this factor weights in favor of detention.

As to the weight of the evidence against Hadi, the Court must weigh the evidence regarding the danger Hadi poses to the public or any person, not the evidence of his guilt. *United States v. Stone*, 608 F.3d 939, 948 (6th Cir. 2010). Likewise, where the flight risk is under consideration, the weight of the evidence goes to the evidence of the flight risk. *United States v. Xiaorong You*, No. 2:19-CR-14, 2019 WL 2426659, at *2 (E.D. Tenn. June 10, 2019). In weighing the evidence on these issues, the Court will consider Hadi's personal history and characteristics and the nature and seriousness of any danger to any person or the community posed by his release.

Evidence regarding any danger posed by Hadi is derived largely from the affidavits submitted by FBI Special Agent Andre Mugnier and Detective William J. Jackson, which were filed in support of the criminal complaints, and by the testimony of Detective Jackson at the detention hearing. In his affidavit, Jackson identifies himself as a deputy U.S. Marshal with the Federal Bureau of Investigation and as a detective with the University of Kentucky Police Department. At the detention hearing, Detective Jackson explained that he has been assigned to an FBI Joint Terrorism Task Force. (DE 20, Tr. at 12-13.)

The Mugnier and Jackson affidavits and Detective Jackson's testimony at the detention hearing recount the contents of three recorded conversations between co-defendant Mahmoud

3

Shalash and a confidential source.

The first recording was of a meeting that occurred on March 12, 2019 at the Days Motel in Lexington between Shalash and the source. Detective Jackson testified that Shalash owns the Days Motel and that Shalash does business there from about 10 until 5. (DE 20, Tr. at 14-15.)

Detective Jackson testified that, prior to the March 12 meeting, the source and Shalash had been communicating with each other on an unidentified different criminal matter. (DE 20, Tr. at 14.) Detective Jackson testified that, in a phone conversation before the meeting, Shalash stated that he wanted to discuss something with the source that "he didn't want to talk about on the phone." (DE 20, Tr. at 14.) Detective Jackson testified that Shalash informed the source that he had lost money to an individual and wanted the source to get his money back. (DE 20, Tr. at 16.)

Detective Jackson watched the recording of the March 12 meeting live as the meeting was happening. (DE 20, Tr. at 15-16.) In his affidavit, Detective Jackson stated that during the meeting, Shalash informed the source that an individual identified as "Victim #1" owed him $80,000. Shalash told the source Victim #1's telephone number and asked the source to retrieve his money. Shalash also provided the source with contact information for an individual who knew Victim #1.

In his affidavit, Detective Jackson stated that, during the March 12 conversation, the source asked Shalash if he wanted Victim #1's legs broken and Shalash responded "no." The source asked Shalash what he wanted and Shalash responded, "All I want is my money." At the detention hearing, Detective Jackson testified that the source offered to "bodily harm" Victim #1 and that Shalash objected. (DE 20, Tr. at 17.) In addition, Detective Jackson testified that the source asked Shalash if he wanted Victim #1's hand in a box and that Shalash stated he did not want any hands in a box. (DE 20, Tr. at 55.) Likewise, the source asked Shalash if he wanted him to kidnap Victim #1's wife, and Shalash stated that he did not want anyone kidnapped. (DE 20,

4

Tr. at 55.)

In a second recorded conversation between Shalash and the source that occurred on April 15, 2019, however, Detective Jackson testified that Shalash instructed the source to "do whatever you have to do to get my money back." (DE 20, Tr. at 18-19.) Shalash gave this instruction knowing that the source had indicated a willingness to use the violent means to collect debts discussed in the first conversation.

The third recording was of an April 30 meeting between the source and Shalash, which also occurred at the Days Motel. Detective Jackson testified that, during the meeting, the source informed Shalash that he may have located Victim #1. (DE 20, Tr. at 19.) Detective Jackson further testified that Shalash informed the source that Victim #1 had done business with another individual, who Detective Jackson identified at the detention hearing as Victim #2. (DE 20, Tr. at 19-20.) Shalash informed the source that Victim #2 owed money to four men in the community, who he identified as Hadi, co-defendant John Sadiqullah, Azizula Hanafi, and Mohammad Mustafa. Shalash further told the source that if the men found Victim #2, they were going to kill him. (DE 20, Tr. at 20-21, 22.) Detective Jackson testified that Victim #2 reportedly owed about two million dollars to individuals in the community. (DE 20, Tr. at 79.)

After Shalash informed the source about the group of men who wanted to kill Victim #2, the source asked if he could meet with the group. Shalash then called Sadiqullah to come to the meeting "to talk to a guy that could help him get his money back." (DE 20, Tr. at 22, 23.)

Detective Jackson testified that, after Sadiqullah arrived at the April 30 meeting, the source asked him what he wanted done with Victim #2 and Sadiqullah stated, "I want him dead." (DE 20, Tr. at 24.) In his affidavit, Detective Jackson stated that Sadiqullah further stated, "If someone could kill him (Victim #2) for $10,000, we all four will pay someone $10,000." At the detention hearing, Detective Jackson testified that Sadiqullah was referring to himself, Hadi,

5

Hanafi, and Mustafa. Detective Jackson testified that he understood Sadiqullah to be offering the source $10,000 from each man. (DE 20, Tr. at 24-25.) Detective Jackson's affidavit states that, when the source stated that they would have to get the money from Victim #2 before killing him, Sadiqullah stated they did not want him alive anymore.

Detective Jackson testified that, on May 2, the source reported that Sadiqullah had called the source to report that he and others had "captured" Victim #2 at his place of business, 20 Dollar Tires in Lexington. (DE 20, Tr. at 26, 35-36.) The source stated that Sadiqullah had asked the source to come to Lexington to "take care of" Victim #2. (DE 20, Tr. at 27.) The source told Sadiqullah that he was not in the area and could not come. He also instructed Sadiqullah not to harm Victim #2. (DE 20, Tr. at 27.) Later, Sadiqullah called the source and, according to the source, stated that the men no longer had Victim #2 "captured", and they were now looking for him. (DE 20, Tr. at 27.)

Detective Jackson testified that his investigation revealed that the confrontation happened inside Victim #2's business, and that it got "heated." (DE 20, Tr. at 36.) The three men left the store and went to a car to call the source. (DE 20, Tr. at 36, 70.) They stayed in the parking lot for about an hour. (DE 20, Tr. at 36.)

Detective Jackson and other law enforcement officers then located Victim #2 and interviewed him. Victim #2 informed the officers that Sadiqullah, Hadi, and Hanafi had arrived at his place of business in Lexington and "confronted him about the money." (DE 20, Tr. at 27.) Detective Jackson testified that Victim #2 described the meeting as "very menacing." (DE 20, Tr. at 27.) Victim #2 stated that his son was present at the place of business when the men arrived, and that Sadiqullah stated, "We know you have a son. We know where your family lives." (DE 20, Tr. at 28.)

Victim #2 also reported that, about three weeks before the confrontation, Hadi, Hanafi, and Mustafa traveled from Lexington to Victim #2's residence in a gated community in Florida and confronted him on his porch. (DE 20, Tr. at 29.) Victim #2 understood that the three "used a ruse" to get into the gated community. He reported they were there for about an hour and demanded that he return their money. (DE 20, Tr. at 29.) Victim #2 stated that, after the confrontation, Hadi sent a text message to Victim #2's wife stating that the men knew where the family lived and that he would return if he did not get his money. (DE 20, Tr. at 28.) Victim #2 stated that Hadi also sent Victim #2's wife a message through Facebook Messenger stating, "Go anywhere. I will find you." (DE 20, Tr. at 28.) In their affidavits, Detective Jackson and Agent Mugnier stated that Victim #2 also stated that he received text messages from Hadi on April 30, 2019 in which Hadi told Victim #2 "not to fuck with him" or Hadi would return.

In their affidavits, Detective Jackson and Agent Mugnier stated that, during the April 30, 2019 meeting, Sadiqullah told the source that he, Hadi, Hanafi, and Mustafa had found Victim #2's house in Florida and discovered that Victim #2 had a lot of gold and diamond rings and that he drove a Range Rover.

Detective Jackson testified that the officers then arrested Shalash, Sadiqullah, and Hadi. (DE 20, Tr. at 30.) Hadi gave two statements to the FBI, both of which were recorded. (DE 20, Tr. at 88.) According to Agent Mugnier's affidavit, Hadi explained why he believed Victim #2 owed him money. He stated that he gave Victim #2 $20,000 in cash to establish a trucking venture, and the venture failed. Detective Jackson testified that Hadi informed the officers that Sadiqullah told him that he had met a person who could help them recover money from Victim #2. (DE 20, Tr. at 32.) Hadi told the officers that he understood that the person Sadiqullah met would "perhaps bind" Victim #2 and "beat him potentially to death." (DE 20, Tr. at 32.) Hadi informed the FBI that he had gone to Victim #2's business. (DE 20 Tr. at 89.) In his affidavit, Agent

7

Mugnier stated that Hadi observed Sadiqullah call the source from the parking lot at Victim #2's place of business to ask him to force Victim #2 to return the funds.

The Court recognizes that there is no evidence that Hadi has had any criminal history prior to this incident. (DE 20, Tr. at 81-82.) And in his motion, Hadi correctly points out that there is no evidence that he had any direct contact with the source or any prior relationship with Shalash. There is evidence, however, that Hadi himself used threatening actions and statements in an effort to get money from Victim #2. These actions included two threatening visits to Victim #2 – one at Victim #2's place of business and a second visit that required traveling from Lexington to Victim #2's residence in Florida. The statements included threatening statements to Victim #2 and to his wife. There is also evidence that Sadiqullah had informed Hadi about the source, that Hadi was aware that the source would possibly beat Victim #2 to death to obtain money from him, and that Hadi went to Victim #2's place of business with Sadiqullah and was there when Sadiqullah called the source and instructed him to come to Victim #2's business to take care of him.

This is clear and convincing evidence that, if not confined pending trial, Hadi poses a serious danger to the community, particularly to Victim #2 and his family.

As to the evidence that Hadi poses a flight risk, the charges contained in the current indictment carry a possible life sentence. It is true that Hadi's wife and five young children live in Lexington. But he does not have other significant ties to the region. He has been here only two years. His mother and four of his five siblings live in Afghanistan and his other sibling lives in Canada. He does not own property in Lexington. It appears that Hadi is a hard worker, but he does not have a job that ties him to Lexington. He currently works as a driver for Lyft and Uber. (DE 20, Tr. at 132.)

Ellen Eggers, a retired schoolteacher, testified that she has known the Hadi family since they

arrived in the United States in 2017. (DE 20, Tr. at 130.) Her church sponsored the Hadi family for three months when they arrived in Lexington. (DE 20, Tr. at 130.) She testified that, after the sponsorship ended, she stayed in touch with the family and helped Hadi's wife, Sida, learn English. (DE 20, Tr. at 130.)

Eggers testified that Hadi is the only source of income for the family and that Sida speaks very little English. (DE 20, Tr. at 132, 135.) While this may be evidence that Hadi would not flee his family if released, it is counteracted by the incentive to flee posed by the seriousness of the charges and potential prison term facing Hadi. Eggers also testified that Hadi would not be a flight risk or pose a danger to the community. (DE 20, Tr. at 136.) But she was not familiar with any of the actions that the evidence indicates Hadi took regarding Victim #2.

Considering all the factors set forth in 18 U.S.C. § 3142(g), the Court finds by a preponderance of the evidence that there are no conditions that would reasonably assure Hadi's appearance if he were released. Considering the same factors, the Court finds by clear and convincing evidence that there are no conditions that could reasonably assure the safety of the public, particularly Victim #2 and his family, if Hadi were released.

Accordingly, the Court hereby ORDERS that Hadi's motion to revoke the magistrate judge's detention order (DE 44) is DENIED.

Dated July 26, 2019.

KAREN K. CALDWELL, CHIEF JUDGE
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY